[Crim. No. 24124. Dec. 11, 1986.]

THE PEOPLE, Plaintiff and Respondent, v.
JUAN RODRIGUEZ et al., Defendants and Appellants.

**COUNSEL**

Tom Takenouchi, under appointment by the Supreme Court, Frank O. Bell, Jr., and Quin Denvir, State Public Defenders, under appointment by the Court of Appeal, and Richard Avila, Deputy State Public Defender, for Defendants and Appellants.

John K. Van de Kamp, Attorney General, John R. Gorey and William V. Ballough, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**LUCAS, J.**—Defendant Juan Rodriguez (hereinafter Juan) appeals after he was charged with and convicted of kidnapping (Pen. Code, § 207; all further statutory references are to this code) and discharging a firearm at an inhabited dwelling (§ 246) while personally using a firearm (§§ 12022.5, 1203.06, subd. (a)(1)). He was sentenced to the lower term of three years with the firearm use enhancement stayed. Defendant Barbaro Rodriguez (hereinafter Barbaro) appeals after he was charged with and convicted of kidnapping (§ 207), for which he received probation and county jail time. Defendants raise five issues on appeal: (1) as Spanish-speaking defendants, they were improperly denied full-time assistance of an interpreter; (2) the evidence supported at most the lesser included offense of false imprisonment, but not kidnapping; (3) the evidence was insufficient to support Juan's section 246 conviction; (4) the trial court improperly excluded evidence regarding Juan's intent; and (5) the trial court had discretion to grant probation to Juan. We will affirm.

Around 2 a.m. on September 10, 1982, Maria de la Luz Michael and her husband returned home after leaving a bar. Defendant Juan followed them and joined them at their home with other guests. At some point, Mrs. Michael's nephew, Mario Ruiz, admired a chain which Juan was wearing, and Juan removed it and gave it to Mario to use.

About 6 a.m., Raul Huerta arrived, and a few minutes thereafter Mrs. Michael drove to the store with Huerta, her nephew and another friend in Juan's automobile. Upon the group's return, Juan demanded the keys to his

car and the return of his chain. The group apparently entered the house without the chain being restored to Juan who then departed.

About 10 minutes later, Juan returned in a car which was driven by defendant Barbaro. Mrs. Michael and Huerta were outside. Juan approached, demanded the return of his chain, and then pointed a gun and fired at the house. Mrs. Michael's son, who was in the house, then called the police.

Juan demanded that Mrs. Michael or Huerta accompany him to find Ruiz. He then pointed the gun at Huerta who entered the car. Huerta appeared frightened and told Mrs. Michael to call the police. Huerta, sitting between Juan and Barbaro, directed the men to the home of Ruiz's mother 10 blocks away. With Juan still pointing the gun at Huerta, they exited the vehicle and Juan proceeded to force his way into the Ruiz home. There, Juan threatened to kill someone if the chain was not returned or he was not given $1,000. Barbaro also demanded that the chain be restored to Juan. After Ruiz's mother convinced defendants that she did not know where her son was, they left and drove Huerta back to the Michael home, Juan continuing to point the gun at Huerta during the drive.

The police arrived at the Michael residence and immediately apprehended Barbaro. They found 12 rounds of .32 Colt ammunition in his pocket, the same caliber as that of a bullet found in the door of the Michael home. Juan was found hiding nearby.

Juan testified that he was angry about Ruiz's failure to return his chain. He asked his cousin Barbaro to assist him and to drive, because he, Juan, was too drunk to drive an automobile. Juan testified he had no gun that day and Huerta voluntarily entered the car to assist in recovering Juan's property. Barbaro similarly testified that Huerta accompanied them under no compulsion and that neither he nor Juan had a gun, nor did he, Barbaro, have any bullets.

At the joint preliminary hearing, two interpreters were sworn. Huerta, testifying for the prosecution, required an interpreter, and one of the two who had been sworn was used for that purpose. The record does not show whose interpreter was so used.

Similarly, at the start of trial, two interpreters, Mona Rich and Enma Helou, were sworn to assist defendants. Enma Helou was thereafter used to interpret for Mrs. Michael, Ruiz's mother, and Huerta. The record specifically indicates Rich remained to interpret for defendants while Helou interpreted for Huerta. Apparently, defendants shared her services during Helou's assistance to two other witnesses as well. The record does not

indicate which interpreter was assigned to act for which defendant. After a court trial, defendants were found guilty as charged and sentenced as described above.

## I. The Right to an Interpreter

■ We turn first to the appropriate standard of review for violations of the right to an interpreter. (Cal. Const., art. I, § 14.)[1] We considered this right in *People* v. *Aguilar* (1984) 35 Cal.3d 785 [200 Cal.Rptr. 908, 677 P.2d 1198], but did not there adopt a particular standard.

In *Aguilar*, we stressed the importance of the presence of an interpreter throughout the proceedings for those who do not understand English. An interpreter is necessary so that a defendant can understand and fully participate in the proceedings when he is charged with a crime. There are three roles which an interpreter may play: (1) interpreting the questions to and answers of non-English-speaking witnesses; (2) advancing the "'non-English-speaking defendant's understanding of the colloquy between the attorneys, the witness, and the judge;'" and (3) enabling the non-English-speaking defendant to consult with his English-speaking attorney. (*People* v. *Aguilar, supra,* 35 Cal.3d at p. 790, quoting Chang & Araujo, *Interpreters for the Defense: Due Process for the Non-English-Speaking Defendant* (1975) 63 Cal. L.Rev. 801, 802.) Deprivation of an interpreter may cause the proceedings in significant part to be incomprehensible to a defendant.

There are three separate possible tests for reversal if an interpreter is improperly denied: (1) per se reversal, (2) the standard enunciated in *Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065], and (3) the test applied to violations of state constitutional rights (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]). We will conclude that per se reversal is not appropriate and that a *Chapman* approach best serves the varied constitutional interests at issue.

Application of the per se standard requiring automatic reversal for a violation of a constitutional right normally is dependent upon the fundamental character of the right invaded or the impossibility of assessing prejudice. (*People* v. *Bigelow* (1984) 37 Cal.3d 731, 744-745 [209 Cal.Rptr. 328, 691 P.2d 994].) This test has not been applied to all deprivations of constitutional rights, even federal constitutional rights (see *Chapman, supra,* 386 U.S. at pp. 21-22 [17 L.Ed.2d at pp. 708-709]; *People* v. *Taylor* (1982)

---

[1] "A person unable to understand English who is charged with a crime has a right to an interpreter throughout the proceedings."

31 Cal.3d 488, 499 [183 Cal.Rptr. 64, 645 P.2d 115]), and we believe that it similarly is unnecessary here. In so concluding, we do not intend to diminish the importance of the right to an interpreter where required. However, our consideration of the panoply of constitutional rights implicated in the use of or denial of an interpreter, and the fact that the violation of these rights does not automatically lead to substantial prejudice, leads us to believe that a different standard is appropriate. Moreover, if a defendant can demonstrate, either on the record or through habeas corpus, that a fundamental right has been infringed, the denial of which as a general rule would lead to automatic reversal, then he may still obtain such relief on that basis. However, we agree with the Court of Appeal that "circumstances may exist in which there could be no prejudice" resulting from the absence of an interpreter. (See *People* v. *Nieblas* (1984) 161 Cal.App.3d 527, 530-531 [207 Cal.Rptr. 695].)[2]

Courts and commentators have consistently named several constitutional interests which may be implicated in the right to an interpreter. They include the right of a defendant to due process, to confrontation, to effective assistance of counsel, and to be present at trial. Our review demonstrates that violation of these rights which may be affected when an interpreter is wrongfully withheld do not necessarily require automatic reversal.

For example, we recently reviewed claims that a defendant had not been personally present during portions of his trial. We reiterated that "'[W]hen the presence of the defendant will be useful, or of benefit to him and his counsel, the lack of his presence becomes a denial of due process of law.' [Citations.] The burden is upon defendant to demonstrate that his absence prejudiced his case or denied him a fair and impartial trial. [Citation.]" (*People* v. *Jackson* (1980) 28 Cal.3d 264, 309-310 [168 Cal.Rptr. 603, 618 P.2d 149]; see *People* v. *Harris* (1981) 28 Cal.3d 935, 955 [171 Cal.Rptr. 679, 623 P.2d 240]; *People* v. *Boehm* (1969) 270 Cal.App.2d 13, 19.) More than a showing of defendant's absence thus is necessary to require reversal. Similarly, the violation of the right to consult counsel may result in reversal only where the breach has had a material effect on the "regularity" of the trial. (See generally *People* v. *Pope* (1979) 23 Cal.3d 412 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].)[3] So, too, as we recently restated, "It

---

[2]The ballot pamphlet for the November 1974 General Election at which the right to an interpreter was made part of the Constitution stated that this right, and others included in the same ballot measure, "already exist in the United States Constitution or in present law. The amendment makes them part of the California Constitution." This language further indicates that the right now memorialized in the state Constitution must be considered in historical and constitutional context and not sui generis.

[3]Of course, where defense counsel who speaks the same language as defendant is required to act as interpreter, the right to effective assistance of counsel is clearly generally deleteriously affected because of the constraints placed on counsel in fulfilling his normal duties at trial. (*People* v. *Aguilar, supra,* 35 Cal.3d at p. 791, fn. 5.)

is well settled . . . that [even the fundamental] right of confrontation is not absolute." (*People* v. *Stritzinger* (1983) 34 Cal.3d 505, 515 [194 Cal.Rptr. 431, 668 P.2d 738].)[4]

The denial of an interpreter in any given case may take many forms and may affect any, all or none of these other constitutional rights. Violations of article I, section 14, may range from complete failure to provide an interpreter to the momentary absence of an interpreter at an inconsequential moment in the proceedings.

Normally, where violations of state constitutional rights are under consideration, the test is whether it is "reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People* v. *Watson, supra,* 46 Cal.2d at p. 836.) However, here, numerous federal constitutional rights may be affected and we therefore adopt a *Chapman* approach under which a federal constitutional error may be deemed harmless only if the appellate court is "able to declare a belief that it was harmless beyond a reasonable doubt." (*Chapman, supra,* 386 U.S. at p. 24 [17 L.Ed.2d at p. 711].) In utilizing this standard "it is our task to examine the entire record and 'if . . . it appears reasonably possible that the error might have materially influenced the jury in arriving at its verdict,' the judgment must be reversed. (*People* v. *Coffey* (1967) 67 Cal.2d 204, 219-220 [60 Cal.Rptr. 457, 430 P.2d 15].)" (*People* v. *Taylor, supra,* 31 Cal.3d at pp. 499-500.) In addition, a court "must weigh the impact of the error not only on the decision of the jury, but also on the course of the trial. (*People* v. *Spencer* [(1967) 66 Cal.2d 158,] 163 [57 Cal.Rptr. 163, 424 P.2d 715].)" (*People* v. *Stritzinger, supra,* 34 Cal.3d at p. 520.)

In viewing the applicable harmless-error standard, the United States Supreme Court recently reiterated that in *Chapman,* it had "rejected the argument that errors of constitutional dimension necessarily require reversal of criminal convictions." To that end, the court observed, "'we have repeatedly reaffirmed the principle that an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt.' *Delaware* v. *Van Arsdall,* 475 U.S. —, —" (*Rose* v. *Clark* (1986) 478 U.S. — [92 L.Ed.2d 460, 469, 106 S.Ct. 3101, 3105].) Although some errors require "reversal without regard to the evidence in the particular case" (*id.*

---

[4]Recently, the United States Supreme Court, in *Delaware* v. *Van Arsdall* (1986) 475 U.S. 673 [89 L.Ed.2d 674, 106 S.Ct. 1431], confirmed that the Sixth Amendment right to confrontation should be measured by a harmless error standard.

at p. — [92 L.Ed.2d at p. 470, 106 S.Ct. at p. 3106] citing *Chapman, supra,* 386 U.S. at p. 23, fn. 8), the court observed that "if the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other errors that may have occurred are subject to harmless error analysis." (*Rose* v. *Clark, supra,* 478 U.S. at p. — [94 L.Ed.2d at p. 471, 106 S.Ct. at pp. 3106-3107] [harmless error standard applied to instruction embodying an unconstitutional presumption]; see also cases described at p. — [92 L.Ed.2d at p. 469, 106 S.Ct. at p. 3105], applying harmless error analysis to claims ranging from denial of a defendant's right to be present at trial [*Rushen* v. *Spain* (1983) 464 U.S. 114, 118 (78 L.Ed.2d 267, 273, 104 S.Ct. 453) (*per curiam*)] to failure to permit cross-examination regarding a witness's bias [*Delaware* v. *Van Arsdall, supra,* 475 U.S. 673 (89 L.Ed.2d 674, 106 S.Ct. 1431)] and permitting admission of identification by a witness which was obtained in violation of the right to counsel [*Milton* v. *Wainwright* (1972) 407 U.S. 371 (33 L.Ed.2d 1, 92 S.Ct. 2174)].)

We first consider whether error occurred because of the practice followed here. The "Standards for determining the need for a court interpreter" appearing as section 18 of the Standards of Judicial Administration are informative. Subdivision (a) provides in relevant part that "[s]eparate interpreters *may* be needed for each non-English speaking party." (Italics added.) In other words, the Judicial Council's recommended rules, adopted effective July 1, 1979, five years following enactment of the pertinent part of article I, section 14, of the Constitution, did not mandate separate interpreters for each party but rather commented that such a service "may" be necessary. Myriad problems have arisen despite the guidance of the judicial standards. ■ We believe that the best and preferred means of avoiding further confusion is to require that each defendant have assigned to him an interpreter who remains at his side throughout the proceedings, unless such assistance has been waived. (See *Aguilar, supra,* 35 Cal.3d at pp. 794-795.) By so providing, speculation regarding possible adverse consequences arising out of shared or absent interpreters can be avoided.

■ With the *Chapman* standard in mind, we now turn to the error urged in the case before us and review the record as a whole to determine whether we can ascertain that any error was harmless beyond a reasonable doubt. Although initially Barbaro asserted before the Court of Appeal that it was "reasonably possible" that the interpreter who remained at the table acted for only one defendant, he now argues, as does his codefendant Juan, that the *sharing* of the interpreter constituted a violation of his rights. Both defendants contend that the procedure utilized may have impaired their right to communicate with counsel and to confront the witnesses against them.

First, the close proximity of defendants and counsel necessitated by a shared interpreter increased the risk that the other defendant and his counsel might overhear consultations, thus possibly restraining free exchange. Second, if the interpreter was utilized for discussions with counsel by one defendant, that practice may have deprived the remaining defendant of his right to a simultaneous and complete translation of the proceedings and also may have affected the remaining defendant's ability to communicate with his attorney.

While both defendants were technically deprived at times of the assistance of separate interpreters, nothing in the record shows that at any point while this situation existed, either defendant's ability to communicate or comprehend was impeded.[5] Although at various times during the appeal defendants have made generalized assertions that their defenses were at odds because the underlying conduct of which each was accused was so different, they have suggested neither an actual nor a potential specific conflict in their defenses. Nonetheless, they urge that the situation of the shared interpreter should be analogized to that where joint counsel is appointed. However, where no objection is made to shared counsel, reversal is appropriate only if an actual conflict is demonstrated or if a potential conflict exists and "the record supports 'an informed speculation' that appellant's right to effective representation was prejudicially affected." (*People* v. *Mroczko* (1983) 35 Cal.3d 86, 105 [197 Cal.Rptr. 52, 672 P.2d 835].) In other words, some grounds to believe that prejudice occurred must be discernible. In light of the failure to point to any potential or actual conflict, we decline to find that the use of a shared interpreter was in this case error on grounds analogous to those used in analyzing issues involving joint representation. Any additional claim in this regard dependent upon nonrecord information may best be raised in a habeas corpus proceeding if appropriate.

Unlike the situation in *Aguilar,* where the use of defendant's interpreter to translate for a witness left the defendant isolated at counsel table, unable to consult his attorney and adrift in a "babble of voices," nothing in the record demonstrates any difficulties arising from the shared use of an interpreter while a second interpreter assisted a witness who spoke the same language as defendants. This is not to say that such difficulties could not or even did not arise. The record simply is barren of any indication of actual interruption of either defendant's communication or comprehension.[6] In

---

[5]In *Van Arsdall, supra,* 475 U.S. 673 at page — [89 L.Ed.2d at page 686, 106 S.Ct. at page 1438], the high court remanded to the state court to determine whether harmless error had occurred. The court explained that "Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to the reviewing courts."

[6]The test is whether an actual material interference with the defendant's rights has been shown or even asserted. In some instances, such as those where there is complete deprivation of the assistance of an interpreter, the record will suffice to demonstrate an error requiring

some instances, in contrast, problems arising from failure to afford one interpreter per defendant will be discernible from the record. For example, in *People* v. *Menchaca* (1983) 146 Cal.App.3d 1019 [194 Cal.Rptr. 691], the court "judicially noticed" that a witness and his interpreter may speak to each other at "relatively close range" (p. 1024), and that a defendant might therefore be unable to hear. The *Menchaca* court in finding reversible error also expressly observed that defense counsel had voiced his apprehensions about the procedures followed. The defense specifically objected to the borrowing of defendant's interpreter for service as a witness interpreter, and it was "manifest from the record that on occasion, counsel was unable to understand the initial English translation of a witness's answer." (*Ibid.*) Similarly, in *United States* ex rel. *Negron* v. *State of New York* (E.D.N.Y. 1970) 310 F.Supp. 1304, 1308, footnote 3 (affd. (2d Cir. 1970) 434 F.2d 386), the trial court pointed out that during the habeas corpus proceedings the defendant had expressly testified that he could not hear the Spanish-speaking witnesses or their interpreters and counsel at the original trial had so stated to the jury during closing arguments. Moreover, as the circuit court observed, defendant had been given only summaries at intervals during the trial and was left "to sit in total incomprehension as the trial proceeded." (434 F.2d at p. 390.)

■ Thus, among possible indications of actual interference with defendant's rights which may appear on the record are remarks by counsel, the court, or defendants themselves. In other instances, the fact that a defendant who does not speak English has been left without means of communication or comprehension will be equally obvious without reference to express remarks made during the proceedings. Nonetheless, in some cases, even where some deprivation is shown, the absence of a personal interpreter may be found harmless because the proceedings which took place while the interpreter was absent may be insubstantial or concern matters which are not possibly prejudicial to the defendant, or because there is no allegation that the deprivation actually affected any of the defendant's rights.

■ Because there is nothing on the face of the record here showing an interference in consultations between counsel and defendants or in defendants' ability to comprehend fully the witnesses' testimony, we conclude that reversal is not mandated.[7] This is not a case where all means of

---

reversal. But in this case, after considering the record as a whole, and considering the evidence adduced against defendants, we cannot conclude that any meaningful error occurred.

[7]We note that defendants' arguments here have centered on possible inability to communicate with counsel and the potential for interference in confidential communications; they have not argued that defendants were, in fact, unable to hear or understand testimony. In reviewing the error claimed, we have also considered the fact that an interpreter sitting by the side of a defendant serves two roles simultaneously: he translates testimony of English-speaking witnesses and court proceedings for the defendant's benefit and he assists in

communication or comprehension were absent; rather, an interpreter was at all times available and at hand. The question is whether speculation that some material interruption in access to the interpreter *may* have occurred is sufficient to require reversal. No actual claim of interference is made. No assertion is made that defendants were actually affected by sharing an interpreter. Of course, habeas corpus may be utilized to offer any relevant evidence not appearing on the face of the record. If such evidence indicates restraints upon defendants' free exercise of their right to counsel or infringement upon any other constitutional right, defendants may well be entitled to relief.

## II. OTHER CONTENTIONS

Defendants assert that the evidence was insufficient in numerous ways to support the finding of a violation of section 207, subdivision (a).[8] At most, they contend, there was a showing of false imprisonment which involves "the unlawful violation of the personal liberty of another." (§ 236.)

■ Barbaro's first assertion is that there was no showing that Huerta's accompaniment of defendants was anything but voluntary. He argues that Juan's display of a gun was "incidental to the movement; it was not its cause." Because the primary intent of defendants was the recovery of Juan's chain, the asportation of Huerta was merely incidental. Barbaro also contends that while Huerta may have acted out of fear, he never expressly repudiated his "offer" to accompany defendants so that the conclusion that they were acting with the good faith belief that Huerta consented to accompany them was "clearly" supported. (See *People* v. *Mayberry* (1975) 15 Cal.3d 143, 153-155 [125 Cal.Rptr. 745, 542 P.2d 1337].)

The argument is somewhat disingenuous. Conceding Huerta was held at gunpoint at least from the moment he entered the car with defendants, Barbaro's argument relies on an assertion that "Apparently, Juan's display of the gun . . . was more for self-protection and to coerce the return of his property, than to effect the movement of Huerta." However, Juan testified he never *had* a gun, and both Juan and Huerta stated they had never seen

communicating with counsel as is required. At times, both roles may overlap and one may "interfere" with another. This overlap is not a necessary basis for finding error. Where defendants, English-speaking or not, have joint counsel, discussions between the attorney and one defendant may cause delay in or interference with the other defendant's access to his counsel. Moreover, whenever a party turns to consult with his attorney while testimony is being elicited, he may miss some of the witness's responses.

[8]"Every person who forcibly steals, takes, or arrests any person in this state, and carries the person into another country, state, or county, or into another part of the same county, is guilty of kidnapping."

each other before Juan returned to the Michael's residence. Thus, the purported explanation is speculation at best. More importantly, defendants ignore the testimony regarding Juan's immediate exhibition of the gun on his return, his firing of the weapon at the Michael home, and Huerta's testimony that when Juan returned he "arrive [*sic*] talking with a gun." Although Juan and Barbaro completely denied their possession of any gun, Huerta consistently testified that he did not volunteer to accompany defendants but walked to the car because he was "threatened with a gun." Mrs. Michael confirmed this when she testified that Juan told Huerta if she did not go with them "then you are going to come with us."

There clearly was sufficient evidence to conclude that defendants did not act in the good faith belief that Huerta voluntarily joined them on their quest for the chain's return. Nothing in *Parnell* v. *Superior Court* (1981) 119 Cal.App.3d 392 [173 Cal.Rptr. 906], supports Barbaro's assertion that it was incumbent upon Huerta to communicate to defendants his fear and his desire to be liberated. In any event, as the Court of Appeal there noted, "Consent of the victim is no defense where the consent is induced by coercion or . . . deception . . . ." (*Id.,* at p. 409.)

Nor does defendants' claim that Huerta's asportation was not their primary goal assist them. In *People* v. *Daniels* (1969) 71 Cal.2d 1119 [80 Cal.Rptr. 897, 459 P.2d 225, 43 A.L.R.3d 677], we held that a section 209 kidnapping did not occur where the movement of the victim was merely incidental to the commission of the underlying felony and did not substantially increase the risk of harm to the victim. In *People* v. *Stanworth* (1974) 11 Cal.3d 588, 596-604 [114 Cal.Rptr. 250, 522 P.2d 1058], we explained that the element of an increased risk to the victim because of the asportation was unnecessary in a charge of simple kidnapping pursuant to section 207. As the Court of Appeal observed in *People* v. *Stender* (1975) 47 Cal.App.3d 413, 420 [121 Cal.Rptr. 334], where a section 207 violation is charged, the existence of an underlying crime is relevant only "to the extent the existence of that other crime unequivocally demonstrates the trivial nature of the movement . . . . Otherwise, the existence of another crime is not a relevant consideration as is manifestly demonstrated by *Stanworth.*"

While defendants may have had a lawful motive ultimately in mind, namely, recovery of Juan's property, their conduct in moving Huerta at gunpoint and against his will in pursuit of that objective still constituted a violation of section 207. (See *People* v. *Sheasbey* (1927) 82 Cal.App. 459, 465 [255 P. 836] [defendant guilty of violation of § 207 when in course of recovering property he believed to be his he ordered his men to seize and bind the possessor of the property and forced him into his truck to accompany the group to town].) In *Sheasbey,* the court observed that "The purpose or

motive of the taking and carrying away has been held to be immaterial in prosecutions for kidnaping." (*Ibid.*)[9] We conclude that the evidence here was sufficient to support the convictions for violation of section 207.

■ Juan next contends that the evidence was insufficient to support his conviction for a violation of section 246. His claim is premised on asserted inconsistencies in various witnesses' testimony which he argues made it unclear whether anyone was in the house when the shots were fired. However, as the Attorney General correctly notes, it is settled that a building is considered "inhabited" if there are permanent residents thereof, even if it is temporarily unoccupied. (*People* v. *Chavira* (1970) 3 Cal.App.3d 988, 992 [83 Cal.Rptr. 851].) On this basis, Juan's contentions clearly must fail.

■ Juan next asserts that the trial court erroneously sustained objections to two questions asked of him by Barbaro's attorney. Counsel first inquired "Was somebody going to help you find your chain?" He next asked "Was Mr. Huerta going to take you to Mario's [Ruiz's] mother's house?" In both instances the court sustained objections raised on the ground that the questions called for opinion.

Juan argues that he was entitled, pursuant to *People* v. *Mayberry, supra,* 15 Cal.3d 143, to show that he entertained a reasonable and good faith belief that the victim accompanied him voluntarily and that he therefore did not have the necessary intent to be found guilty of kidnapping. Although this is true, the questions to which the objections were sustained did not go to that issue but rather asked Juan to give his opinion about the intentions of *others*.

The second question was rephrased after the objection to inquire "Did Mr. Huerta tell you that he was going to take you to Miss Ruiz's house?" and in that form was answered without exception. The questions as posed did not inquire of Juan what his belief was, but rather asked what others believed, and therefore were properly rejected. No error occurred.

■ Next, Juan argues that the trial court erroneously believed that it did not have discretion to grant him probation. In support, he maintains that this court declared (*People* v. *Williams* (1981) 30 Cal.3d 470 [179 Cal.Rptr. 443, 637 P.2d 1029]) that *People* v. *Dorsey* (1972) 28 Cal.App.3d 15 [104 Cal.Rptr. 326], had not been overturned by our decision in *People* v. *Tanner* (1979) 24 Cal.3d 514 [156 Cal.Rptr. 450, 596 P.2d 328]. In *Dorsey,* the Court of Appeal held that the trial court had the power to dismiss

---

[9]As we stated in *People* v. *Mayberry, supra,* 15 Cal.3d at page 156, the *Sheasbey* court did not indicate "that a wrongful *intent* on the part of the defendant is not required for kidnapping (Pen. Code, § 207)." (Italics added.)

findings of use of a firearm in the absence of legislative intent to the contrary. In *Tanner,* we held that the Legislature's enactment of section 1203.06 disclosed an intent to preclude the exercise of judicial discretion where a use finding had been made.

The language in *Williams* referring to *Dorsey* merely indicated that it and similar cases remained valid as support for the proposition that "section 1385 is applicable in the absence of a specific indication by the Legislature to the contrary." (30 Cal.3d at p. 483.) We did not purport to overrule the specific holding in *Tanner* which continues to apply here. Section 1203.06 precluded the trial court from striking the use finding; the exercise of judicial discretion permitted pursuant to section 1385 was inapplicable in the face of the more specific proscription on the court's power. The trial court properly concluded it could not grant probation under the circumstances.

CONCLUSION

We hold that the proper standard of review to be utilized where the state constitutional right to an interpreter has been violated is that described in *Chapman.* Nothing will prevent defendants from raising any additional constitutional claims should they be appropriate. In some instances, where the record does not reveal error or does not reveal any likely material effect caused by an apparent violation, the defendant may wish to proceed via habeas corpus proceedings.

We further conclude that no prejudicial error was demonstrated here requiring reversal under the applicable standard of review. None of the other claims raised require reversal.

The judgment is affirmed.

Mosk, J., Broussard, J., and Grodin, J., concurred.

Bird, C. J., and Reynoso, J., concurred in the judgment only.