[No. D000223. Fourth Dist., Div. One. Nov. 4, 1987.]

THE PEOPLE, Plaintiff and Respondent, v.
PEDRO RAMON BAEZ, Defendant and Appellant.

**COUNSEL**

Victoria Sleeth, under appointment by the Court of Appeal, for Defendant and Appellant.

Gerald Blank as Amicus Curiae on behalf of Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Jay W. Bloom, John W. Carney, Peter Quon, Jr., Pat Zaharopoulos and Edward J. Mantyla, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**WIENER, Acting P. J.**—An information charged Pedro Ramon Baez with fatally shooting his wife Tomasa on November 2, 1981 (Pen. Code, §§ 197, 12022.5).[1] Baez pleaded not guilty and not guilty by reason of insanity. A jury found him guilty of second degree murder and sane at the time of the offense. Baez unsuccessfully moved for a new trial and was sentenced to prison for an indeterminate term of 17 years to life.

Baez appeals contending the judgment should be reversed because the court prejudicially erred in (1) "borrowing" his interpreter to serve as a witness interpreter; (2) permitting the introduction of his statements to the detective, the prosecution-hired psychiatrist, and the prosecutor's investigator, and (3) refusing to pay for testing necessary to establish his defense. We agree with Baez's first argument and hold the "borrowing" of his interpreter to serve as the interpreter for five prosecution witnesses and one defense witness requires reversal.[2] As directed by the Supreme Court we have modified our original opinion, filed September 17, 1985, to make appropriate reference to the recent decision in *People* v. *Rodriguez* (1986) 42 Cal.3d 1005 [232 Cal.Rptr. 132, 728 P.2d 202].

### FACTUAL AND PROCEDURAL BACKGROUND

#### A.

Baez, born in 1929 in Puerto Rico, immigrated to and lived in New York for 22 years. He left his wife and his five children, came to San Diego in 1974 and eventually secured work as a janitor at Triple A Shipyard. In 1979 a friend introduced him to Tomasa, a Mexican national who lived and worked in Tijuana. Baez married Tomasa two months later. Their brief marriage was hardly tranquil. They had many problems. Tomasa refused to sleep with Baez; he hit her and threw her down. They called each other names—Baez called Tomasa and her family "Mexican pigs;" Tomasa called Baez a "dog." Finally Tomasa left Baez and petitioned to dissolve their

---

[1] All statutory references are to the Penal Code unless otherwise specified.

[2] Because of our conclusion we do not address the effect of the court's error in using the "preponderance of the evidence" standard rather than the correct "beyond a reasonable doubt" standard in permitting the introduction of Baez's statements to law enforcement agents. The correct standard will be applied to the facts upon retrial. We also do not address the court's alleged error in refusing to authorize and pay for an electroencephalogram to confirm Baez had an alleged epileptic seizure during the shooting. The record before us shows no abuse of discretion as the request was untimely, not warranted by the evidence and of speculative value. When and if counsel should renew this motion in a timely manner on a sounder record the court can rule on this issue in a manner consistent with Baez's right to effective assistance of counsel.

marriage. Baez wanted his wife to return. She refused. Baez then loaned her money to help her buy a car and house, the latter on her promise to reconcile. After having Baez deed the property to her she still refused to reconcile.

Baez was laid off from work in June 1981. By September or October his money was running out, his unemployment insurance was about to expire, and he was depressed. Tomasa offered to let Baez stay at her house. In October 1981 Baez bought a gun. On October 27 or 29 he bought bullets.

On November 1, Baez visited Tomasa at her mother's house in Tijuana. There was a suggestion she might reconcile. She was to contact him about 7 a.m. the next day to talk about getting back together. Between 6 and 7 a.m. on November 2, Tomasa called her sister, Maria Ramirez, and said she was late getting to work and could not go to Baez's house. About 7 a.m. Tomasa called Baez and told him the same thing. She said he could see her about 8:30 a.m. near her work where she parked her car. Baez loaded his gun. He then went to meet Tomasa. Her car was parked near a playground or park in Chula Vista. Baez sat in the front seat; Tomasa in the rear. They talked for five or six minutes. He asked her to return to him. Tomasa refused. She said she would sleep with a Black man or a dog before she would return to him. Standing outside the car Baez pulled out his gun, "lost his head" and fired several shots. He then tried to shoot himself but was unable to do so. He told some people in the park to call the police because he had just shot his wife.

### B.

At trial Baez had a court-appointed interpreter. The need for a Spanish-speaking interpreter was more than a formality. It was clear Baez required someone to translate from English to Spanish. Fred Godwin, the personnel manager at Triple A, testified Baez could not speak English "very well at all" and had a difficult time making himself understood. Someone usually translated Godwin's English statements into Spanish for Baez. Two other employees from Baez's place of employment testified similarly. Gerald Blank, Baez's lawyer, confirmed Baez's difficulty to communicate in English. When Blank spoke Spanish he was able to communicate with his client. Blank decided Baez simply could not speak or understand enough English to permit him to communicate in English. In order for Baez to understand, Blank had to speak Spanish.

### C.

During trial four of Tomasa's Spanish-speaking relatives were called by the prosecutor during the prosecution's case-in-chief: Encarnacion Ortega

DeLugo (Tomasa's mother), Maria Ramirez (Tomasa's sister), Felipe Enzo Ramirez (Maria's husband) and Encarnacion Ortega DeLugo Morris (Tomasa's sister). Ruben Rodriguez, who testified for the prosecution about Baez obtaining the gun, also spoke Spanish. Before calling these witnesses it was agreed Baez's interpreter would also serve as the witnesses' interpreter. The court explained to the jury: "The next witness speaks Spanish. We just have one interpreter so we're going to try to get by with one, probably have Mr. Baez move to where he could be sure to hear Spanish. It will require a little bit of change here in the courtroom. [¶] Mr. Baez, would you step forward and sit in this little green chair. . . ."

While Baez was relocated to enable him to hear the questions and answers in Spanish his interpreter served as the interpreter for the five prosecution witnesses. His interpreter was also called upon to read Baez's suicide note in English to the jury. When Atanasia Melendes testified for the defense, Baez's interpreter also was borrowed. On rebuttal the prosecutor recalled DeLugo, Maria Ramirez, Felipe Enzo Ramirez, and Ruben Rodriguez. He also called Tomasa's sister, Alcelia DeLuga Ortega, and two of Tomasa's friends, Maria Garcia and Maria Ellena Lopez Josso. Baez's interpreter also served as the witness interpreter for these witnesses.

### DISCUSSION

■ The court erred in borrowing Baez's interpreter. Article I, section 14 of the California Constitution requires "[a] person unable to understand English who is charged with a crime has a right to an interpreter *throughout the proceedings.*' (Italics added.)" (*People* v. *Aguilar* (1984) 35 Cal.3d 785, 790 [200 Cal.Rptr. 908, 677 P.2d 1198].)

When we filed our original opinion in this case, the difficult question presented was by what standard we should judge whether the error required reversal. (Compare, e.g., *People* v. *Menchaca* (1983) 146 Cal.App.3d 1019, 1023 [194 Cal.Rptr. 691] with *People* v. *Carreon* (1984) 151 Cal.App.3d 559, 574-575 [198 Cal.Rptr. 843].) That issue has now been resolved by the Supreme Court in *People* v. *Rodriguez, supra,* 42 Cal.3d 1005 in favor of applying the test of *Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824, 24 A.L.R.3d 1065].

Applying this standard, we address the People's arguments that no prejudice occurred in this case. ■ First, they rely on the fact that Baez's counsel agreed to the borrowing of the interpreter. This argument was rejected in *Aguilar,* the court holding that the defendant must personally and knowingly waive his right to an exclusive interpreter. (35 Cal.3d at p. 794.) The record here is devoid of any indication that Baez understood

his right to have an independent interpreter throughout the proceedings or any statement by Baez that would suggest a personal waiver.

 Several other factors, however, distinguish this case from the facts of *Aguilar*. Chief among them is that Baez's counsel, Gerald Blank, is fluent in both Spanish and English. Thus, the lack of a personal interpreter did not inhibit attorney-client communications since Baez could directly communicate with Blank. Furthermore, the *Aguilar* court's concern with a check on the accuracy of the interpreter's translation (see 35 Cal.3d at pp. 793, 794, fn. 10) was also not a factor since Blank could and in fact did question the translation where he disagreed. The People also point out that when the interpreter was borrowed, Baez was moved to a location in the courtroom where he could hear both the questions and answers in Spanish. (Compare *Aguilar, supra,* 35 Cal.3d at p. 792; *People v. Menchaca, supra,* 146 Cal.App.3d at p. 1024.) Thus, the record here strongly indicates Baez was able to understand the substance of the trial proceedings.

There remains, of course, the fact that the lack of an exclusive interpreter precluded Baez receiving a translation of the "open-court colloquy between the bench and counsel" and the rulings of the court. (*Menchaca, supra,* 146 Cal.App.3d at p. 1025, quoted in *Aguilar, supra,* 35 Cal.3d at p. 792.) Were this the only possible prejudice suffered by Baez, we would be hard-pressed to conclude that reversal of the conviction was mandated in view of the fact that even English-speaking defendants rarely understand to any significant extent the legal dialogue which occurs between court and counsel. Moreover, we have reviewed the colloquy which took place in this case and cannot conceive that Baez's understanding or lack thereof could possibly have had any impact on the outcome.

There are, however, other facts which suggest more substantial forms of prejudice. It is true that Baez was not unable to communicate with counsel due to a language barrier. But in moving the defendant to a position in the courtroom where he could hear both the questions and answers in Spanish, it appears that Baez was separated from his counsel. Thus, although not linguistically incapacitated, Baez was physically inhibited from communicating with his lawyer. (Compare *Rodriguez, supra,* 42 Cal.3d at pp. 1015-1016, emphasizing that at least one interpreter "was at all times available" to two codefendants to facilitate communication with counsel.) The fact that a defendant can arrange for consultation with his attorney by interrupting the proceedings has been held to be insufficient to dispel prejudice. (*People v. Resendes* (1985) 164 Cal.App.3d 812, 816-818 [210 Cal.Rptr. 609].)

We also note that the witnesses who necessitated the borrowing of Baez's interpreter did not testify on collateral or insignificant issues. Of the five

Spanish-speaking witnesses who testified during the prosecution's case-in-chief (see *ante,* p. 1434-1435), four were questioned regarding prior threats made by Baez to kill Tomasa and one testified about selling Baez the gun used to kill Tomasa. Under these circumstances, we cannot conclude that the error was harmless beyond a reasonable doubt.

DISPOSITION

Judgment reversed.

Work, J., and Butler, J., concurred.

Respondent's petition for review by the Supreme Court was denied February 17, 1988.