# FOR PUBLICATION

ATTORNEY FOR APPELLANT:

**LORINDA MEIER YOUNGCOURT**
Lawrence County Public Defender Agency
Bedford, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**AARON J. SPOLARICH**
Deputy Attorney General
Indianapolis, Indiana

**FILED**

Dec 21 2012, 9:23 am

**CLERK**
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| KENNETH S. TIPTON, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 47A01-1201-CR-4 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE LAWRENCE SUPERIOR COURT
The Honorable William G. Sleva, Judge
Cause No. 47D02-0908-FA-652

**December 21, 2012**

**OPINION – FOR PUBLICATION**

**MAY, JUDGE**

Kenneth Tipton was convicted of Class C felony criminal recklessness;[1] Class D felony dealing in marijuana;[2] and being an habitual offender[3] after he shot at a house during a standoff with police. He argues on appeal the evidence was insufficient to convict him of criminal recklessness because that offense requires proof there was a risk of injury to a person, but nobody was in the house when he shot at it.[4] We affirm.

## FACTS AND PROCEDURAL HISTORY[5]

On August 16, 2009, two Bedford police officers went to Tipton's house to arrest him after his wife reported a domestic battery. Tipton's brother Donnie allowed the officers to

---

[1] Ind. Code § 35-42-2-2.

[2] Ind. Code § 35-48-4-10.

[3] Ind. Code § 35-50-2-8.

[4] Tipton also argues the trial court erred because it did not designate which conviction was to be enhanced by the habitual offender finding. When a defendant is convicted of multiple offenses and found to be an habitual offender, the trial court must impose the resulting penalty enhancement on only one of the convictions, and it must specify the conviction to be enhanced. *McIntire v. State*, 717 N.E.2d 96, 102 (Ind. 1999). Failure to specify requires remand to correct the sentence as it regards the habitual offender status. *Id*. The State acknowledges the trial court did not designate the conviction to which the habitual offender enhancement was to be attached.

Remand is not required in light of the facts before us. The court ordered a twelve-year habitual offender sentence enhancement, and a twelve-year enhancement could be imposed only if the enhancement was attached to Tipton's Class C felony conviction. "The court shall sentence a person found to be a habitual offender to an additional fixed term that is not less than the advisory sentence for the underlying offense nor more than three (3) times the advisory sentence for the underlying offense." Ind. Code § 35-50-2-8(h). The sentence enhancement available for Tipton's criminal recklessness conviction was four to twelve years: "A person who commits a Class C felony shall be imprisoned for a fixed term of between two (2) and eight (8) years, with the advisory sentence being four (4) years." Ind. Code § 35-50-2-6. The sentence enhancement possible for Tipton's dealing in marijuana conviction was 18 months to 4.5 years: "A person who commits a Class D felony shall be imprisoned for a fixed term of between six (6) months and three (3) years, with the advisory sentence being one and one-half (1 ½ ) years." Ind. Code § 35-50-2-7. Thus, the court could have been attaching the sentence enhancement only to Tipton's sentence for Class C felony criminal recklessness.

[5] We heard oral argument in Indianapolis on October 23, 2012. We commend counsel on the quality of their oral advocacy.

enter the house, and he told the officers he was there alone. As one officer walked toward the hallway, he saw Tipton coming toward him with a gun. The officer yelled "gun" and both officers tried to exit through the front door. (Tr. at 1639.) Tipton fired a shot while the officers were still in the house.

The officers ran in different directions when they left the house, and they sought cover behind trucks. Tipton fired at one of the officers, and then retreated into the house. The other officer called for reinforcements. Tipton allowed his brother to leave the house, but then he fired another shot. After additional officers arrived, Tipton fired more shots, two of which hit a police car. Some shots hit the house across the street. The residents, Adam Mullis and his wife, were not home at the time.

Police spoke to Tipton on the telephone, and Tipton agreed he would surrender if he were charged with only a minor offense. An officer at the police station wrote a letter saying Tipton would be charged only with criminal recklessness if he surrendered, and the officer read the letter to Tipton over the telephone. Tipton surrendered, but then was charged with criminal recklessness along with three other charges: attempted murder,[6] dealing in marijuana,[7] and being an habitual offender.

A jury acquitted Tipton of attempted murder but found him guilty of the other charges. The court sentenced him to a total of twenty-three years.

---

[6] Ind. Code § 35-41-5-1 (attempt); 35-42-1-1 (murder).

[7] After Tipton surrendered, police searched his house and found what they called a "marijuana grow operation." (Tr. at 1611.)

**DISCUSSION AND DECISION**

A person who recklessly, knowingly, or intentionally performs an act that creates a substantial risk of bodily injury to another person commits criminal recklessness. Ind. Code § 35-42-2-2. The offense is a Class C felony if it is committed "by shooting a firearm into an inhabited dwelling or other building or place where people are likely to gather." *Id.* Tipton argues the State did not prove the element "substantial risk of bodily injury to another person" because nobody was in the dwelling when Tipton shot at it.

The State initially notes, correctly, that the plain language of the statute does not require that the person who faces the risk of injury be an inhabitant of the house, nor does it explicitly require "any person be physically inside of the building at the exact moment of the defendant's reckless action." (Br. of Appellee at 13.) As there were a number of other persons who were at risk, specifically all the police officers, the State argues the statutory requirements are satisfied.

We decline to affirm on that ground, as that is not the way the State charged Tipton or prosecuted him. The charging information stated Tipton performed "an act that created a substantial risk of bodily injury to another person by shooting a firearm into an inhabited dwelling, to wit [the Mullis residence]." (App. at 19.) It did not allege the police officers were at risk. In its opening statement, the State told the jury "the evidence is going to show you and you're going to be firmly convinced that he committed criminal recklessness. When he's shootin [sic] in the inhabited house behind him, the place where his neighbors live gets shot up." (Tr. at 601.) In closing argument, the State argued to the jury that:

4

> [Tipton] surrendered, but not before the damage was done, not before . . . the home of Adam Mullis, the place where Adam Mullis slept, the place where Adam Mullis, [sic] had food in his refrigerator, a TV to watch, a couch to sit on in the living room. [Tipton] surrendered but not before he had shot that house. . . . Adam Mullis lived there. He inhabited that house and Kenny Tipton's shooting was reckless.[8]

(*Id*. at 1882-83) (footnote added).

We must therefore determine whether Tipton's acts created "substantial risk of bodily injury" to the Mullises. They did. We reviewed our decisions on the object of "substantial risk" in *Smith v. State*, 688 N.E.2d 1289 (Ind. Ct. App. 1997). Smith test fired his pistol at an old car parked in his backyard. Several homes were located within a fifty-yard radius of the old car. Inside one home that was in Smith's direct line of fire, a light and a television were on, but a police officer could not get anyone inside that house to come to the door. There was a "large mass of people," *id*. at 1290, walking on the street near Smith's home. They were leaving a festival at a nearby park and were in range of Smith's gunfire. Smith contended the State presented insufficient evidence his conduct created a substantial risk of bodily injury.

Distinguishing decisions that found no such risk, we disagreed:

> "Substantial" risk is risk that has "substance or actual existence." *Boushehry v. State,* 648 N.E.2d 1174, 1177 (Ind. Ct. App. 1995)[, *reh'g denied, trans. denied*] (citing *Elliott v. State,* 560 N.E.2d 1266, 1267 (Ind. Ct.

---

[8] During trial, Tipton's counsel asked for a directed verdict on the criminal recklessness count on the ground the State did not name the "other person" who was allegedly placed at risk of injury. (Tr. at 1681.) The State responded it was not necessary that the "other person" be named, but then went on to say:
> The State has proved the other person though. The State has met its burden. The person came in, testified, Your Honor, Adam Mullis came in and testified that he, it was common, likely for him to be at home on a Sunday in an evening at that residence. So I, I've met beyond, or I mean I've met the threshold to survive a directive [sic] verdict.

(*Id*. at 1689.) The court denied the motion for directed verdict on the criminal recklessness count.

App. 1990)). Smith points to our opinions in *Boushehry* and *Elliott* in support of his argument that the State relied on mere speculation that his actions posed a substantial risk of bodily injury to another person. However, both cases relied upon by Smith are distinguishable from the instant case.

In *Elliott,* the defendant fired five pistol shots from his place of business over uninhabited fields and woodlands which bordered his business. *Elliott,* 560 N.E.2d at 1267. Some of Elliott's employees were present at the time; however, none of the employees were in his line of fire. *Id.* Moreover, although hunters were known to hunt in the adjacent fields and woodlands, no evidence was presented that anyone was present in the woodlands or fields. *Id.* Accordingly, we reversed Elliot's criminal recklessness conviction concluding that his conduct did not create a substantial risk of bodily injury to another person "because there were no people in or near his line of fire." *Id.*

Similarly, in *Boushehry,* the defendant went to a vacant lot and fired two or three shots from his .22 caliber rifle at some geese. *Boushehry,* 648 N.E.2d at 1176. The defendant's shots were fired in the direction of Shelbyville Road, which bordered the vacant lot. *Id.* As with the "non-existent hunters in *Elliott,*" we concluded that the possibility of a motorist passing by on Shelbyville Road at the time the defendant fired his gun presented "only a remote risk of bodily injury." *Id.* at 1177. Because the record contained no evidence that anyone was in or near the defendant's line of fire, we held that the State failed to prove the actual existence of substantial risk of bodily injury to another person. *Id.*

Unlike in *Boushehry* and *Elliott,* the evidence and reasonable inferences to be drawn therefrom indicate that there were individuals in or near Smith's line of fire. Here, the State presented evidence that Smith test fired his gun at least six times in his backyard by shooting at an old car. Officer Baldwin testified that there were approximately ten residential homes located within fifty yards of the car, and that one of the homes was in the direct line of Smith's gunfire. Although nobody answered the door of that home upon Officer Baldwin's investigation, Officer Baldwin stated that he noticed both a light and a television on in the home, creating a reasonable inference that a person was in the home at the time of the Smith's activity. Moreover, the record shows that a large mass of people inhabited the street near Smith's backyard at the time of his test firing because a festival had just ended at a park nearby. Indeed, Officer Baldwin testified that Smith's test firing activity occurred within a "stone's throw" of these people.

Based upon this evidence, the jury could reasonably infer that Smith's conduct created an actual and substantial risk of bodily injury to another person. There was sufficient evidence to support his conviction for [sic] criminal recklessness.

*Id*. at 1291. In the case before us, as in *Smith*, a reasonable inference could have been drawn that a person might have been in the Mullis home when Tipton shot at it.

The statute under which Tipton was charged requires there be an *inhabited* dwelling: "criminal recklessness is a Class C felony if it is committed by shooting a firearm into *an inhabited dwelling* or other building or place where people are likely to gather."[9] Ind. Code § 35-42-2-2. Tipton argues the house was not the "inhabited dwelling" the statute requires because nobody was home. He notes a statutory definition of "dwelling"[10] as "a building, structure, or other enclosed space, permanent or temporary, movable or fixed, that is a person's home or place of lodging," Ind. Code § 35-31.5-2-107, and claims: "If the Legislature intended to elevate criminal reckless [sic] to a class C felony simply upon a showing that the building or structure shot into was a 'person's home or place of lodging,' then the word dwelling would have sufficed." (Reply Br. of Appellant at 4.) *Compare* Ind. Code § 35-43-2-1 (burglary is a Class B felony if it is committed while armed with a deadly weapon or the building or structure is a dwelling).

While we recognize our obligation when reviewing a statute to, "if possible, give effect to every word and clause therein," *Indiana State Bd. of Health v. Journal-Gazette Co.*, 608 N.E.2d 989, 992 (Ind. Ct. App. 1993), *opinion adopted sub nom. Indiana State Bd. of Health v. State Journal-Gazette Co.*, 619 N.E.2d 273 (Ind. 1993), we decline to hold a

---

[9] In its charging information the State alleged only that Tipton shot into an inhabited dwelling. It did not allege he shot into some other building or place where people are likely to gather.

[10] There does not appear to be a statutory definition of "inhabited" or "inhabited dwelling."

7

dwelling is necessarily "uninhabited" for criminal recklessness purposes when its residents are briefly away.

Our Supreme Court has addressed the burglary statute, which refers only to a "dwelling," and not an "inhabited" dwelling. It is clear in that context that a place may be a "dwelling" even when the residents are temporarily away. In *Phillips v. State*, 514 N.E.2d 1073 (Ind. 1987), Phillips claimed the residences he broke into were not dwellings,[11] so he could not be found guilty of Class B felony burglary. The buildings burglarized were places of residence, but at the time of the burglaries the residents were spending some of the winter months out-of-state. Phillips cited *Smart v. State*, 244 Ind. 69, 190 N.E.2d 650 (1963), which was based on an earlier version of the burglary statute. Before its 1982 amendment, the statute defined first-degree burglary as breaking and entering a dwelling or other place of human habitation. *Smart* and other decisions held the statute required a showing the building was a dwelling and that persons were dwelling in it at the time of the break-in. *Phillips*, 514 N.E.2d at 1075. The amended statute, now Ind. Code § 35-43-2-1, provided the offense of breaking into a structure was a class B felony if the building or structure was a dwelling:

> We agree that the present statute does not require the occupier of the residence to be in the home at the time of the burglary. Here, the evidence revealed the structures were the permanent places of residence of the Perkins's and Ellis's. The fact they were temporarily out of the homes on vacation at the times of the break-ins does not remove the homes from the definition of dwellings. We therefore find no reversible error on the issue of sufficiency of the evidence to support the convictions.

---

[11] At that time, a "dwelling" was defined as "a building, structure, or other enclosed space, permanent or temporary, movable or fixed, that is a person's home or place of lodging." Ind. Code § 35-41-1-10.

8

514 N.E.2d at 1075.

We reached the same conclusion where arson was involved, but like the burglary statute, the arson statute requires only a "dwelling," not an "occupied" or "inhabited" dwelling. *See White v. State*, 846 N.E.2d 1026, 1030 (Ind. Ct. App. 2006) (noting arson is committed when a person, "by means of fire, knowingly damages a dwelling of another person without the other person's consent") (quoting Ind. Code § 35–43–1–1(a)(1)), *trans. denied. And see generally* T. T. F. Huang, Annotation, *Vacancy or nonoccupancy of building as affecting its character as "dwelling" as regards arson*, 44 A.L.R.2d 1456 (1955):

> Whether or not the vacancy or nonoccupancy of a particular building will affect its status as a "dwelling" in connotations pertaining to the crime of arson depends upon the circumstances giving rise to such vacancy or nonoccupancy. Speaking generally, an unfinished or incomplete building which has not yet been occupied will not be regarded as a "dwelling" even though designed as a dwelling house and destined to be so used on completion. Conversely, where a building originally used as a dwelling house has been abandoned for such purposes or where such a building has been without a tenant or occupant for a prolonged period, it will not be regarded as a "dwelling."
>
> On the other hand, the mere temporary absence of occupants, at the time of the fire, from a building in general use as a dwelling house will not, in the view of most courts, alter the status of the structure as a "dwelling" for purposes pertinent to arson prosecutions.

(Footnotes omitted.)

It does not appear our appellate courts have addressed whether a dwelling remains "inhabited" when the people who live there are temporarily away from home, but decisions from other courts are instructive. In *Carthern v. State*, 529 S.E.2d 617 (Ga. 2000), a jury

found Carthern guilty of criminal damage to property[12] in the first degree for shooting a gun into the house of a neighbor. Carthern fired his gun as he walked down his street at four o'clock in the morning. The family that lived in the house was on vacation, but the Court noted there was no evidence Carthern knew no one was home. *Id*. at 618.

The issue in Carthen's appeal was whether the act of firing a gun into a residence when no one is physically present interferes with property in a manner so as to endanger human life. "Construing the phrase 'endanger human life' to mean reckless endangerment[13] of another, we hold that a person who fires gunshots into an inhabited dwelling where people are likely to be present endangers human life within the meaning of the statute." *Id*. (footnote added). The Court noted Carthern "fired a gun at night into an inhabited dwelling where residents were likely to be present, thus recklessly endangering the life of another. The fact that the occupants of the house were not physically present does not lessen the risk of danger to others or the recklessness of his behavior." *Id*. at 620. That Court apparently believed a residence was "inhabited" as long as someone was "likely" to be inside.

The California Supreme Court surveyed decisions addressing what it means for a dwelling to be "inhabited." *People v. Hansen*, 885 P.2d 1022, 1027 (Cal. 1994), *reh'g denied*, *overruled on other grounds by People v. Sarun Chun*, 203 P.3d 425 (Cal. 2009):

---

[12] That offense is committed when a person "[k]nowingly and without authority interferes with any property in a manner so as to endanger human life." Ga. Code § 16-7-22.

[13] The *Carthern* court followed "the Model Penal Code's formulation that the 'actual risk of danger' must exist and the defendant must at least act recklessly. This interpretation is consistent with the purpose of the statute in seeking to protect human life and recognizes the heightened punishment for criminal damage to property when human safety is threatened." 529 S.E.2d at 620.

10

The discharge of a firearm at an inhabited dwelling house -- by definition, a dwelling "currently being used for dwelling purposes, whether occupied or not" [citing Cal. Penal Code § 246, which establishes the offense of "shooting at inhabited dwelling house"] -- is a felony whose commission inherently involves a danger to human life. An inhabited dwelling house is one in which persons reside (*People v. Rodriguez* (1986) 42 Cal.3d 1005, 1018, 232 Cal.Rptr. 132, 728 P.2d 202) and where occupants "are generally *in* or *around* the premises." (*People v. White* (1992) 4 Cal.App.4th 1299, 1303, 6 Cal.Rptr.2d 259, italics in original.) In firing a gun at such a structure, there always will exist a significant likelihood that an occupant may be present. Although it is true that a defendant may be guilty of this felony even if, at the time of the shooting, the residents of the inhabited dwelling happen to be absent (*People v. Rodriguez, supra,* 42 Cal.3d at p. 1018, 232 Cal.Rptr. 132, 728 P.2d 202), the offense nonetheless is one that, viewed in the abstract—as shooting at a structure that currently is used for dwelling purposes—poses a great risk or "high probability" of death within the meaning of *Patterson.* The nature of the other acts proscribed by section 246 reinforces the conclusion that the Legislature viewed the offense of discharging a firearm at an *inhabited dwelling* as posing a risk of death comparable to that involved in shooting at an *occupied* building or motor vehicle.

Similarly, in *Matter of Mario Y*, 428 N.Y.S.2d 71, 74 (App. Div. 1980), a juvenile argued shooting at a house that was normally occupied as a residence was not reckless endangerment because the occupants worked during the day and he believed that it was unoccupied at the time. The court rejected that argument: "Appellant's total disregard of the possibility that someone might be home constituted such a gross disregard of the risk and such a gross deviation from the standard of conduct that a reasonable person would observe in the situation as to constitute reckless endangerment." *Id*.

We adopt the reasoning of those courts that have held the fact the occupants of a house were not physically present does not lessen the risk of danger to others or the recklessness of his behavior and that shooting at a structure currently used as a dwelling

11

poses a great risk or "high probability" of death. We accordingly hold a residence may be "inhabited" for criminal recklessness purposes if someone is likely to be inside.

While the weight of authority suggests the resident need not be at home for there to be an "inhabited dwelling," Tipton notes the State tried him on the premise that the only persons placed at "substantial risk of bodily injury," Ind. Code § 35-42-2-2, were the Mullises, and they were not home. He makes a due process argument based on *Dunn v. United States*, 442 U.S. 100, 106 (1979), where the Supreme Court said:

> To uphold a conviction on a charge that was neither alleged in an indictment nor presented to a jury at trial offends the most basic notions of due process. Few constitutional principles are more firmly established than a defendant's right to be heard on the specific charges of which he is accused.

This is not a situation where a variance between the charging information and the evidence presented at trial raises a due process concern. A charging information must allege the elements of the crime such that the accused is sufficiently apprised of the nature of the charges against him so that he may anticipate the proof and prepare a defense in advance of trial. *Bayes v. State*, 779 N.E.2d 77, 80 (Ind. Ct. App. 2002), *trans. denied*. The State is not required to include detailed factual allegations in the charging instrument. *Id*. "A variance is an essential difference between the charging instrument and the proof presented at trial." *Id*.

Tipton's charging information alleges he shot into the "inhabited dwelling" at 2419 J Street, (App. at 19), and that act created "a substantial risk of bodily injury *to another person*." *Id*. (emphasis added). The charging information therefore does not necessarily seem to be inconsistent with the argument the State makes on appeal that the statute is

12

satisfied if *any* "other person" is at risk of injury. Nor does there appear to be a "variance" between the general charging information and the more specific argument and evidence offered at trial.

Instead, it appears Tipton is arguing the evidence was insufficient to support his conviction because the only persons the State argued Tipton placed at substantial risk of bodily injury, the Mullises, could not in fact have been at any such risk -- they were not present at the time of the shooting. As explained above, we believe someone shooting a gun at a residence may, for purposes of a criminal recklessness prosecution, create a substantial risk of bodily injury to another person even if the resident is away from home at the moment of the shooting. We must accordingly affirm Tipton's conviction.

Affirmed.

BAKER, J., and SHEPARD, Sr. J., concur.