Filed 6/28/24

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| MILTON JONAS ARIAS MOLINA,<br><br>     Petitioner,<br><br>     v.<br><br>THE SUPERIOR COURT OF SANTA CRUZ<br><br>     Respondent;<br><br>THE PEOPLE,<br><br>     Real Party in Interest. | No. H050669<br>(Santa Cruz<br>Super. Ct. No. 18CR06559) |

In this mandamus proceeding, the petitioner, Milton Jonas Arias Molina, was held to answer on charges of special circumstances murder, conspiracy to commit murder, and street terrorism after a preliminary examination at which he and his two codefendants, Jose Leonard Alfaro Juarez and Elmer Ernesto Mendez Lopez, were required to share a single Spanish-language interpreter during the presentation of evidence. Molina seeks writ relief after the trial court denied his subsequent Penal Code section 995[1] motion to dismiss based on the failure to provide him with his own interpreter throughout the preliminary examination.

As we explain below, based on the circumstances of this case, we conclude that the failure to provide an individual interpreter for Molina at his preliminary examination

---

[1] Unspecified statutory references are to the Penal Code.

reasonably might have affected the outcome. Accordingly, we will issue the writ of mandate instructing the trial court to vacate its order denying Molina's motion to dismiss and enter a new order granting that motion, without prejudice to the Santa Cruz County District Attorney refiling the charges and conducting a new preliminary examination.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. The preliminary examination

The charges in this case arise from a homicide that took place in October 2018. In a complaint filed on October 18, 2018, the Santa Cruz County District Attorney charged Molina and his two codefendants with one count of murder (§ 182, subd. (a)(1); count 1), one count of conspiracy to commit murder (§ 187, subd. (a); count 2), and one count of street terrorism (§ 186.22, subd. (a); count 3). The complaint further alleged two special circumstances—that the murder was committed by means of lying in wait (§ 190.2, subd. (a)(15)), and that the murder was committed for the benefit of a criminal street gang (§ 190.2, subd. (a)(22))—along with various other firearm and gang sentencing enhancements.

According to the testimony presented at the preliminary examination by cooperating witnesses (Witness 1 and Witness 2), Molina is alleged to have planned the killing. Witness 1 and Witness 2, who were members of the same gang as Molina, testified that Molina taught them about the gang's structure and also organized and oversaw the gang's meetings. Witness 1 described Molina as a "shot caller" for the gang. Both Witness 1 and Witness 2 testified that, at Molina's direction, they took part in transporting the victim to a remote location in the Santa Cruz Mountains. Molina's codefendants, Juarez and Lopez, were present as well. As the group sat near the side of the road drinking beer, Molina shot the victim in the head before encouraging his two codefendants, as well as Witness 1 and Witness 2, to stab the victim. Molina's DNA, as

2

well as both codefendants' DNA, was found on cigarette butts and beer cans recovered from the scene of the murder.

In all, the preliminary examination was conducted in 13 sessions over the course of 15 months, with the first hearing taking place on March 9, 2020 and the last on June 25, 2021. Due to safety concerns raised by the Santa Cruz County Sheriff's Department, Molina and his codefendants had both hands and their legs shackled during the testimony of Witness 1 and Witness 2. The trial court allowed the defendants to have one hand free during the remainder of the proceedings.[2] On the first day of the preliminary examination, Molina's counsel objected that the hearing would be conducted with a single interpreter for all three defendants in violation of the California Constitution. Counsel for Molina's codefendants joined in the objection. The prosecutor also voiced her concerns about the lack of interpreters, stating she did not want to "go through a preliminary hearing just to have to do it again." The magistrate stated that he intended to proceed with the hearing, with the understanding that if any of the defendants needed to speak with counsel, he would interrupt the proceedings to permit that. The magistrate also advised the parties that if "any of [the defendants] have a problem understanding what is happening in the courtroom, they should immediately advise their counsel so that we can stop and make certain that they understand exactly what's happening." The minute order on March 9, 2020 reflects five different interpreters were utilized.[3] It does

_____

[2] Molina's counsel objected and asked that Molina have both hands free, but the trial court denied that request. Molina does not raise this issue in his writ petition.

[3] Throughout the entirety of the preliminary examination, the minute orders and transcript from each hearing indicate that there were as few as one or as many as five interpreters present throughout a given day. Unfortunately, the record does not consistently reflect how many interpreters are present at any given time or how they are involved in the hearing, i.e., whether they were interpreting for one or more of the defendants, for the witnesses, or both. "In a criminal proceeding, an interpreter may perform three interrelated but distinct roles: (1) as a 'witness interpreter,' to enable

3

not appear from the record (and no party has suggested) that Molina was ever provided more than a single interpreter to share with his codefendants at any given time during the 15-month preliminary examination.

We briefly recount pertinent details from the subsequent 12 hearings to provide further context:

(1) March 10, 2020 – the magistrate opened the hearing by indicating that he had inquired about additional interpreters for the preliminary examination and had been informed that other departments had a need for interpreter services as well. However, the magistrate indicated "[w]e're trying to get as many interpreters in this courtroom as possible." The transcript from the hearing does not disclose how many interpreters were present in court during the testimony of the first three witnesses, all of whom spoke English.[4] Witness 1 took the stand and testified in Spanish. The magistrate told "the interpreters" that if they needed a break at any time, the court would accommodate their request. During a later break in proceedings, the magistrate asked that the three interpreters present in the courtroom identify themselves for the record, which they did.

---

questioning of witnesses who do not speak English; (2) as a 'proceedings interpreter,' to assist a non-English-speaking defendant to understand the exchanges at trial among attorneys, witnesses, and the court; and (3) as a 'defense interpreter,' to enable a non-English-speaking defendant to communicate with the defendant's English-speaking attorney. [Citation].)" (*People v. Romero* (2008) 44 Cal.4th 386, 410 (*Romero*).) We encourage trial courts to identify on the record the names of the interpreters who are present as well as which of the three aforementioned roles they performed during the proceedings.

[4] We say this because at no time during those witnesses' testimony was there any interruption in the proceedings where a new interpreter was brought in to provide a break for the prior interpreter nor was there any request from an interpreter to clarify what an attorney or a witness said.

The minute order for that hearing reflected that four interpreters in all had appeared throughout the session.[5]

(2) March 11, 2020 – Witness 1 returned to the stand and although the court noted that all parties and counsel were present, there was no indication as to how many interpreters were in the courtroom.[6] At some point, one of the defense attorneys noted that there were some technical issues with the audio equipment and, after the proceedings were paused and then resumed, a second defense attorney noted that the audio problems continued and she was concerned about her client's "ability to perceive" what had occurred.[7] When testimony resumed, the record did not indicate how many interpreters were present, but there were several points later in the hearing where the record reflected a pause for a new interpreter. The minute order for that hearing reflected four interpreters had appeared throughout the session.

(3) August 17, 2020 – Witness 1 continued his testimony. The magistrate noted at the outset of the hearing that "all defendants are being assisted by our court certified interpreter, who satisfies the criteria of Government Code 68561[, subdivision] (g)." All defense counsel renewed their objection that their clients did not have an individual interpreter, with one attorney noting "the interpreter that is translating for the defendants will also be translating for the witness, and the witness's answer will be translated by a different interpreter." The court again informed the defendants that they should interrupt the proceedings if they did not understand what was happening or if they needed to talk to counsel. At the conclusion of the hearing, an interpreter stated that interpretation

---

[5] Presumably the fourth interpreter was not physically present in the courtroom at the time the three interpreters identified themselves on the record.

[6] At least one interpreter was present, as the transcript reflects an occasional interruption from an interpreter to clarify testimony or questioning.

[7] The hearings were periodically interrupted due to malfunctioning audio equipment.

services for the following day would be "very tight" as there were only "three interpreters." The minute order for that hearing reflected four interpreters had appeared throughout the session, specifically identifying one interpreter "interpreting for the defendants" and a second "interpreting for the witness."

(4) August 18, 2020 – Witness 1 continued his testimony. During the afternoon session, the magistrate took a break, stating that he had earlier promised "the interpreter" he would do so. The minute order for that hearing again reflected four interpreters had appeared with two identified as "interpreting for the [d]efendants" and another two "interpreting for the witness."

(5) August 19, 2020 – Witness 1 resumed his testimony, with the Spanish-language interpreter noting that there was a problem with the witness's headphones. The transcript reflects two pauses due to problems with the "audio streaming." The minute order for that hearing reflected that four interpreters had appeared throughout the session, with two "interpreting for the [d]efendants" and two "interpreting for [] Witness []1."

(6) November 9, 2020[8] – Witness 1 returned again to testify. Prior to his testimony resuming, defense counsel indicated that only three interpreters were present and "a minimum of four" are required. The magistrate acknowledged they were "short at least one interpreter" but proceeded with the hearing with the understanding that more frequent breaks would be taken. Molina's counsel subsequently informed the court that Molina was having difficulty understanding the interpreter and also was having issues with the audio.

(7) November 10, 2020 – the preliminary examination continued with the gang expert's testimony. The transcript does not reflect how many interpreters are present at

---

[8] The record does not include a copy of the minute order from this hearing so we do not know how many interpreters were identified in that document or appeared during that session.

any given time or their arrangement in the courtroom. The minute order for that hearing reflected only two interpreters had appeared throughout that session.

(8) November 12, 2020 – at the outset of this hearing, the magistrate stated on the record that "[a]ll parties are being assisted by a court certified interpreter." The minute order for that hearing indicated three interpreters appeared throughout that session.

(9) June 1, 2021 – the preliminary examination resumed and the magistrate again noted that "all defendants are being assisted by our interpreters throughout this process." Molina's counsel stated, "I did want to renew make [*sic*] a continuing motion that it is my belief I think counsel join in that belief that each defendant is entitled to have their own interpreter. [¶] The Court had provided a single interpreter who is interpreting simultaneously for all three defendants and they're all wearing headsets." In addition, Molina's counsel indicated, "when the last Spanish speaking witness was present [Witness 1] my understanding is that the questions posited to the witness were posited in English. [¶] They were interpreted by the interpreter for the defendants and that interpretation was the one the witness received as well. The witness answered in Spanish. [¶] The understanding was that the defendants would try to listen to the answer in Spanish. There was a separate interpreter that interpreted the Spanish answer into English for purposes of the record. [¶] That Spanish translation – that Spanish to English translation was not translated back for the defendants. So they were – they did not hear – although they may have been able to hear the answer in Spanish, they did not hear what was placed in the record. …. [¶] That may sound redundant but I think that allows them to understand what's being placed in the record." The prosecutor responded, "one would hope that the interpretation is the same. Otherwise I think we have a bigger issue if what is being translated is not what the witness said. …. [¶] But I don't think it's created a due process issue thus far given there's an oath that it's being correctly interpreted." The

7

magistrate concluded, "I don't see it as a due process issue either. But your [i.e., Molina's counsel's] concern is noted for the record."

Before Witness 2 took the stand, the victim's wife, who observed the proceedings from the audience, complained that she could not hear through the equipment provided to her. After a break, the court thanked "our interpreters" for their "efforts … in working with the defendants and the individual in the courtroom." The minute order for that hearing reflected that five interpreters appeared throughout that session.

(10) June 2, 2021 – Witness 2 continued his testimony and the court noted that the parties, counsel, and "our interpreters" were present, although the number of interpreters was not specified. At one point during the hearing, the interpreter noted an inability to "hear anything that's happening" possibly due to "interference" from where counsel was standing. The minute order for that hearing reflected three interpreters appeared throughout that session.

(11) June 3, 2021 – Witness 2 remained on the stand and, prior to testimony being taken, the magistrate stated, "Counsel are present, parties are present, our interpreters are present, [and] our witness is present." Again, the magistrate did not specify how many interpreters were in the courtroom at any given time or which interpreter was assigned to translate for the defendants or the witness. The minute order for that hearing reflected two interpreters appeared throughout that session.

(12) June 25, 2021 – Witness 2 resumed testifying, and the magistrate noted the presence of the parties, counsel, and the witness but did not reference any interpreters. At one point during the morning session, the interpreter asked to switch. Before adjourning, the court confirmed that there was no further need for "the interpreter." The minute order for that hearing reflected two interpreters appeared throughout that session.

8

At the conclusion of the preliminary examination, Molina and his codefendants were held to answer on all charges and the Santa Cruz County District Attorney filed an information on July 12, 2021.[9]

### B. The section 995 motion to dismiss the information

On November 23, 2021, Molina moved to dismiss the information pursuant to section 995 (section 995 motion), arguing that the failure to provide a separate interpreter for him throughout the preliminary examination deprived him of his constitutional rights to confer with counsel, effectively confront his accuser, and participate in the proceedings.

The trial court denied the section 995 motion on November 4, 2022. In explaining its decision, the trial court acknowledged that while "what occurred was not the best practices[,] [*sic*]" it was satisfied "beyond a reasonable doubt that any error concerning the failure to provide an interpreter for each of the three defendants at the preliminary hearing [was] harmless." The court further noted that, at the trial, "if each of the three defendants demonstrate that each of them have a need for an interpreter, a separate interpreter will be provided for each of them … with a separate interpreter for any Spanish speaking witnesses."

After Molina filed the instant writ petition, we stayed further proceedings and requested preliminary opposition from the Attorney General. Having received the Attorney General's preliminary opposition, Molina's reply thereto, along with supplemental briefing we requested from both parties,[10] we issued an order to show cause

---

[9] The information was substantially identical to the complaint except that it transposed counts 1 and 2, i.e., the charge of murder (count 1 in the complaint) was count 2 in the information and the charge of conspiracy to commit murder (count 2 in the complaint) became count 1 in the information.

[10] In our request for supplemental briefing, we asked the parties whether the proper standard of review is "the harmless beyond a reasonable doubt standard outlined

9

on December 7, 2023. The Attorney General elected to rely on its preliminary opposition and supplement brief in lieu of a return. Respondent superior court filed a response as well.[11] Having reviewed the parties' briefing and the record, we will grant the petition for writ of mandate and/or prohibition.

## II. DISCUSSION

Molina argues that failing to provide an individual interpreter at the preliminary hearing violated a substantial right and was thus structural error. Consequently, in Molina's view, our analysis "should end here" and the petition should be granted without any showing of prejudice. The Attorney General argues that not providing an individual interpreter for each defendant during a preliminary hearing is not a violation of a substantial right and does not create a structural defect requiring per se reversal. Instead,

in *Chapman v. California* (1967) 386 U.S. 18, which the Supreme Court used when deciding whether a judgment should be reversed for the improper denial of an interpreter at trial (see *People v. Rodriguez* (1986) 42 Cal.3d 1005, 1010); the prejudicial error standard, which the Supreme Court has used when deciding whether the denial of a pre-trial defendant's substantial right at the preliminary examination affects the legality of his or her commitment (see, e.g., *People v. Konow* (2004) 32 Cal.4th 995, 1024; *People v. Standish* (2006) 38 Cal.4th 858, 882); or some other standard?" We further asked that the parties "identify specific parts of the record showing whether petitioner suffered prejudice sufficient to meet the proper standard of review."

[11] Normally, in a mandamus proceeding, "the trial court … though a nominal respondent, is nonetheless a neutral party in the underlying controversy between the parties, and as such, has a duty to remain impartial." (*James G. v. Superior Court* (2000) 80 Cal.App.4th 275, 280.) That is because it is "the real party in interest, not the respondent court, [which] has [a] beneficial interest in the litigation and is the aggrieved party." (*Ibid.*) Nonetheless, "[t]here are some types of mandate proceedings … in which the trial court is the real adverse party, as where a writ proceeding *directly affects the operations and procedures of the trial court or may impose financial obligations that would directly affect the court's operations.* [Citation.]" (*State Farm Mutual Automobile Ins. Co. v. Superior Court* (2004) 121 Cal.App.4th 490, 499, italics added.) As we recognize that our decision here may directly impact both the trial court's operations and its financial obligations, we have filed respondent superior court's response and address its arguments below.

10

the Attorney General asserts the proper standard for review is whether the purported error reasonably might have affected the outcome as set forth in *People v. Konow, supra,* 32 Cal.4th 995 at p. 1024.

We are not aware of any California appellate decision which has addressed whether the denial of an individual interpreter at a preliminary examination is within the narrow category of errors which by its very nature is a violation of a substantial right or whether it is instead an error which a petitioner must show reasonably might have affected the outcome. We need not reach the issue of whether the failure to provide an individual interpreter for Molina is a violation of a substantial right requiring reversal per se because, even reviewing for prejudice, we conclude that Molina has established that this error was "not minor but 'reasonably *might* have affected the outcome' " of the preliminary hearing. (*People v. Standish, supra,* 38 Cal.4th at p. 883.)

### A. *Standard of review*

" '[I]n proceedings under section 995 it is the magistrate who is the finder of fact; the superior court has none of the foregoing powers, and sits merely as a reviewing court; it must draw every legitimate inference in favor of the information, and cannot substitute its judgment as to the credibility or weight of the evidence for that of the magistrate. [Citation.] On review by appeal or writ, moreover, the appellate court in effect disregards the ruling of the superior court and directly reviews the determination of the magistrate … .' [Citation.]" (*People v. Gonzalez* (2017) 2 Cal.5th 1138, 1141.) In this case, we must determine whether the information must be set aside on the ground that Molina "had not been legally committed by [the] magistrate." (§ 995, subd. (a)(2).)

An information will not be set aside based on "some irregularity or minor error in procedure in the preliminary examination" but "where it appears that, during the course of the preliminary examination, *the defendant has been denied a substantial right*, the commitment is unlawful within the meaning of section 995, and it must be set aside upon

11

timely motion." (*Jennings v. Superior Court* (1967) 66 Cal.2d 867, 874, citations omitted, italics in original (*Jennings*).)[12]  The California Supreme Court subsequently "appl[ied] the lesson of *Jennings* … to hold that a defendant is denied a substantial right affecting the legality of the commitment when he or she is subjected to prejudicial error, that is, error that reasonably might have affected the outcome [citation]." (*Konow*, *supra*, 32 Cal.4th at p. 1024.)  Two years later, the Supreme Court clarified, "[W]e do not mean that the defendant must demonstrate that it is reasonably probable he or she would not have been held to answer in the absence of the error.  Rather, the defendant's substantial rights are violated when the error is not minor but 'reasonably *might* have affected the outcome' in the particular case.  [Citation.]" (*Standish*, *supra*, 38 Cal.4th at pp. 882–883.)

Both *Konow* and *Standish* rely on *People v. Pompa-Ortiz* (1980) 27 Cal.3d 519 (*Pompa-Ortiz*) in addressing claims of error that occur at the preliminary examination.[13]  In *Pompa-Ortiz*, the California Supreme Court, addressing a postconviction challenge to irregularities affecting a criminal defendant's preliminary hearing rights, held that "irregularities in the preliminary examination procedures which are not jurisdictional in the fundamental sense shall be reviewed under the appropriate standard of prejudicial

---

[12] *Jennings* listed several examples of substantial rights the denial of which had been found to merit dismissal of the indictment including denial of "the right to the assistance of counsel at the preliminary hearing [citations]," failure to advise the accused of the right to counsel, conducting a hearing on the accused's evidentiary objections in the absence of defense counsel, etc.  (*Jennings*, *supra*, at pp. 874–875.)

[13] " '[D]enial of a substantial right at the preliminary examination renders the ensuing commitment illegal and entitles a defendant to dismissal of the information on timely motion … .' " (*Konow, supra,* 32 Cal.4th at p. 1023, quoting *Pompa-Ortiz, supra*, 27 Cal.3d at p. 523.)  *Standish*, however, cautioned that "*People v. Pompa-Ortiz* must not be read overbroadly.  That case did not establish that *any and all* irregularities that precede or bear some relationship to the preliminary examination require that the information be set aside." (*Standish*, *supra*, 38 Cal.4th at p. 885.)

error and shall require reversal only if defendant can show that he was deprived of a fair trial or otherwise suffered prejudice as a result of the error at the preliminary examination. The right to relief without any showing of prejudice will be limited to pretrial challenges of irregularities." (*Id*. at p. 529.) "As *Pompa-Ortiz* makes clear, the rule requiring a showing of prejudice does not apply when the denial of a substantial right at the preliminary hearing stage of the proceedings is challenged before the defendant's trial and conviction. When the challenge is made before the defendant's trial and conviction, the rule remains the information must be set aside without any affirmative showing of prejudice. If the issue is raised before trial, the court reaffirmed in *Pompa-Ortiz*, 'prejudice is presumed and the information is dismissed' without any affirmative showing. (*Pompa-Ortiz*, *supra*, 27 Cal.3d at pp. 529, 530.)" (*Harris v. Superior Court* (2014) 225 Cal.App.4th 1129, 1147.)

The Supreme Court subsequently clarified that, in the context of pre-trial proceedings such as preliminary examinations, "a right is substantial when denial of the right results in a denial of due process." (*Avitia v. Superior Court* (2018) 6 Cal.5th 486, 494 (*Avitia*).) "[W]e hold that outside a narrow category of errors that 'by their nature constitute a denial of a substantial right' and hence require dismissal 'without any showing of prejudice,' a defendant seeking to set aside an indictment before trial must show that an error 'reasonably might have affected the outcome.' [Citation.]" (*Id*. at p. 497.) "At a preliminary hearing, '[s]ubstantial rights within the meaning of section 995 have been held to include the right to counsel, cross-examination and the presentation of an affirmative defense at the preliminary hearing, and substantial procedural rights such as the statutory right to complete the hearing in one session and to have a closed hearing. [Citations.].' " (*Jackson v. Superior Court* (2018) 25 Cal.App.5th 515, 537.)

13

### B. Criminal defendants have a right to an individual interpreter at a preliminary examination

In California "[t]he right to an interpreter has its underpinnings in a number of state and federal constitutional rights." (*Romero, supra,* 44 Cal.4th at p. 410.) Specifically, article I section 14 of the California Constitution provides that, "[a] person unable to understand English who is charged with a crime has a right to an interpreter throughout the proceedings." (Cal. Const., art. I § 14.) The right to an interpreter implicates several constitutional interests, including "the right of a defendant to due process, to confrontation, to effective assistance of counsel, and to be present at trial." (*People v. Rodriguez, supra,* 42 Cal.3d at p. 1011.)

The California Supreme Court has made clear "California's Constitution does not provide a half measure of protection. Rather, it requires that when an interpreter is appointed for a criminal defendant, that interpreter must be provided to aid the accused *during the whole course of the proceedings*." (*People v. Aguilar* (1984) 35 Cal.3d 785, 790 (*Aguilar*), italics added.) As highlighted in *Aguilar*, "[t]he defendant's right to understand the instructions and rulings of the judge, the questions and objections of defense counsel and the prosecution, as well as the testimony of the witnesses is a continuous one. At moments crucial to the defense—when evidentiary rulings and jury instructions are given by the court, when damaging testimony is being introduced—the non-English speaking defendant who is denied the assistance of an interpreter, is unable to communicate with the court or with counsel and is unable to understand and participate in the proceedings which hold the key to freedom. Thus, the 'borrowing' of the interpreter, the accused's only means of communicating with defense counsel and understanding the proceedings, was a denial of a constitutional right." (*Id*. at pp. 790–791.) "Without an interpreter, the trial is reduced to 'a babble of voices' to the defendant. [Citation.] Sensitivity toward language difficulties is the hallmark of our multilingual state. This sensitivity has been appropriately elevated to constitutional proportions when

14

the state, through the criminal process, places the life and liberty of the non-English speaker in jeopardy." (*Id.* at p. 794.) Because the California Supreme Court has determined that the right to an individual interpreter exists during the entire course of criminal proceedings (*id.* at p. 790), a defendant has the right to an individual interpreter at the preliminary hearing as well as at trial.

Under California law, and contrary to the trial court's statement, appointment of an individual interpreter to a criminal defendant during a preliminary hearing is not just "best practices," it is a constitutional right. " 'The California Constitution, as interpreted by the California Supreme Court, makes it clear that a defendant is entitled to two interpreters, one to interpret the witnesses' testimony and the other to be the personal interpreter for the defendant.' [Citation.]" (*People v. Suarez* (2020) 10 Cal.5th 116, 146.) "Compelling reasons exist for the appointment of more than one interpreter: '[It] is nearly impossible for one interpreter to translate the testimony of a witness while simultaneously translating and listening to the discussions between defendant and counsel. It is in these circumstances that a defense interpreter is most needed to ensure adequate representation by the defendant's counsel.' (Chang & Araujo, [*Interpreters for the Defense: Due Process for the Non-English-Speaking Defendant* (1975) 63 Cal.L.Rev. 801,] 821–822.)" (*Aguilar*, *supra*, 35 Cal.3d at p. 793.) Requiring an interpreter for the witness and an individual interpreter for each defendant "has additional benefits to the criminal justice system because 'it is difficult for an interpreter who has worked closely with the defendant and his counsel in the preparation of the defense from the pretrial stage to translate the court proceedings impartially. Finally, a separate defense interpreter would serve to ensure the accuracy of the proceedings and witness interpreters.' [Citation.]" (*Ibid.*)

We are mindful that "[t]he denial of an interpreter in any given case may take many forms and may affect any, all or none of [the] constitutional rights [to due process,

to confrontation, to effective assistance of counsel, and to be present at trial].  Violations of article I, section 14 [of the California Constitution], may range from complete failure to provide an interpreter to the momentary absence of an interpreter at an inconsequential moment in the proceedings."  (*Rodriguez, supra*, 42 Cal.3d at p. 1012.)

Although the United States Supreme Court has not recognized a constitutional right to a court-appointed interpreter, (*United States v. Johnson* (7th Cir. 2001) 248 F.3d 655, 663), it is axiomatic that "[c]onsiderations of fairness, the integrity of the fact-finding process, and the potency of our adversary system of justice forbid that the state should prosecute a defendant who is not present at [their] own trial, [citation], unless by [their] conduct [they] waive[] that right.  [Citation.]"  (*United States ex rel. Negron v. New York* (2d. Cir. 1970) 434 F.2d 386, 389 (*Negron*).)  Further, "it is equally imperative that every criminal defendant—if the right to be present is to have meaning—possess 'sufficient present ability to consult with [their] lawyer with a reasonable degree of rational understanding.'  [Citation.]"  (*Ibid*.)  The criminal defendant's "incapacity to respond to specific testimony would inevitably hamper the capacity of his counsel to conduct effective cross-examination."  (*Id*. at p. 390.)

### C. Failing to provide Molina an individual interpreter reasonably might have affected the outcome of the preliminary hearing

As stated above, "a defendant bringing a pretrial challenge to an information on the basis that he or she was not ' "legally committed" ' by a magistrate, need only show that the error ' "reasonably *might* have affected the outcome" ' and need not show 'it is reasonably *probable* he or she would not have been held to answer in the absence of the error.' [Citation.]"  (*Berardi v. Superior Court* (2007) 149 Cal.App.4th 476, 493.)  Utilizing the aforementioned standard, based on the circumstances in this case, we conclude that the record sufficiently establishes that the failure to provide Molina an individual interpreter over the course of 15 months and 13 sessions precluded his ability

16

to meaningfully participate in a criminal proceeding and limited his ability to challenge the evidence presented against him. Therefore, such an error "reasonably might have affected the outcome." (*Konow*, *supra*, 32 Cal.4th at p. 1024.)

The Attorney General mainly relies on *Rodriguez* for the proposition that failing to provide an individual interpreter for Molina was harmless. In *Rodriguez*, at both the joint preliminary hearing and trial, two interpreters were assigned to assist both defendants. On several occasions, one of the assigned interpreters was used to assist a Spanish-speaking witness during their testimony, leaving one interpreter for the two defendants. (*Rodriguez*, *supra*, 42 Cal.3d at pp. 1009–1010.) Utilizing the *Chapman* standard in conducting a post-trial review, the *Rodriguez* court concluded the record was devoid of any indication from counsel, the court, or the defendants that there was an objection to the interpreter assignments and relatedly any problems with communication or comprehension by the defendants. (*Rodriguez*, *supra*, at pp. 1014–15.) Ultimately, "[t]he test is whether an actual interference with defendant's rights has been shown or even asserted." (*Id.* at p. 1014, fn. 6.) This case is distinguishable from *Rodriguez* for several reasons.

First, on March 9, the initial day of the preliminary examination, Molina's counsel objected to the prospect of sharing a single interpreter among the three defendants. Codefendant Lopez's counsel joined in the objection and raised the ongoing issues with the headsets "where sometimes not all the words are interpreted or understood by the mechanism of the headset. Therefore, [my client was being] denied his right to … confront and cross-examine the witnesses against him." Codefendant Juarez's counsel added "it's very hard to effectively represent [my client] without the ability to confer with him during the proceedings when we have a situation with the headphones." The prosecutor was also keenly aware of the significance of this problem and the risk of proceeding with the preliminary examination under these circumstances. She stated, "I

actually join in the concerns [of the defendants] Your Honor … given the complexity of this case. … [¶] I certainly don't want to go through a preliminary hearing just to have to do it again."

The objections concerning the limited number of interpreters continued throughout the preliminary examination. Unlike *Rodriguez*, the preliminary examination record in this case is replete with ongoing objections by counsel, problems hearing witnesses, or improperly working headsets. For example, counsel for codefendant Lopez informed the court that her client could not "hear anything on his headphones" on March 9, 2020 (Day 1). On March 10, 2020 (Day 2), Lopez's counsel said that there was feedback on "the headset" and later said there was "a crackling, static sound going on with my client's headphone" which caused her "concern[] [as to] how that's affecting his ability to perceive everything that's happening." At the August 17, 2020 hearing (Day 4), as Molina's counsel was beginning his cross-examination of Witness 1, he renewed his objection to not having an individual interpreter, adding that the COVID protocols increased the challenges of having a single interpreter. Counsel stated, "I believe the situation today to maintain social distancing is different than what we had five months ago. My understanding is that the interpreter that is translating for the defendants will also be translating for the witness, and the witness's answer will be translated by a different interpreter. To the extent that that is even farther afield than my position, I want to raise an objection and just make the record clear on that." Then, on June 1, 2021 (Day 10), just before Witness 2 took the stand, Molina's counsel renewed his objection and made "a continuing motion … that each defendant is entitled to have their own interpreter."

We specifically highlight the problem noted by Molina's counsel after the testimony of Witness 1. After each question was presented in English to Witness 1, the proceedings interpreter provided a Spanish translation of the question to the three

18

defendants, the witness, and the general audience. After Witness 1 provided a response in Spanish, the witness interpreter translated Witness 1's response into English for the record. It appears undisputed from the record that the defendants *never received a Spanish translation of the English which became the record* related to Witness 1's testimony. Molina's counsel objected that his client, as relates to the critical testimony of Witness 1, "did not hear what was placed in the record."

Without the assistance of an individual interpreter to provide such translation for Witness 1, neither Molina nor his attorney were in a position to challenge the contents of a key portion of the record which was utilized to establish the elements of the charges and related enhancements. Such an error is not minor or inconsequential. "[I]f a defendant does not understand both questions and answers, he is denied the ability to 'spontaneously understand' the testimony." (*In re Dung T.* (1984) 160 Cal.App.3d 697, 708.)

The California Supreme Court in *Aguilar* noted the importance of having two interpreters: One to interpret a non-English-speaking witness's testimony into English for the record and the second to translate the English translation back into the defendant's language in order "to check the accuracy or competency of the witness interpreter's translation." (*Aguilar*, *supra*, 35 Cal.3d at p. 793, fn. 10.) Without a second interpreter, the defense is "effectively preclude[d] … from challenging or impeaching the interpretation rendered, because objection regarding accuracy of the interpretation must be made below. [Citation.]" (*Ibid.*) In this case, without an individual interpreter for himself and another for witnesses, the preliminary examination "is reduced to 'a babble of voices.' " (*Id.* at p. 794.)

The Attorney General argues that the record from the preliminary examination does not indicate that Molina's ability to communicate with counsel or comprehend what was occurring at the hearing was materially impacted by sharing an interpreter with his

19

codefendants and witnesses. The Attorney General does not articulate what the record *should* show beyond the repeated objections of defense counsel and confirmation that a critical portion of the record was not translated into Spanish for Molina. For example, we do not expect Molina or his attorney to waive attorney-client privilege and disclose to this court and the prosecution—while charges are currently pending in the trial court—what subject matters Molina misunderstood or that he might have discussed with counsel at the preliminary examination but was unable to do so due to the lack of an individual interpreter.

The Attorney General also finds it significant that the court invited the defendants to ask for breaks if they wanted to speak with their attorney during the preliminary examination. However, we are not persuaded that the magistrate's standing offer to interrupt the proceedings if any of the defendants wished to communicate privately with counsel adequately addressed the prejudice shown here. "The fact that a defendant can arrange for consultation with his attorney by interrupting the proceedings has been held to be insufficient to dispel prejudice." (*People v. Baez* (1987) 195 Cal.App.3d 1431, 1436.) Moreover, we note that, on the first day of the preliminary examination, Molina's counsel asked to speak with his client privately, and the court asked, "For how long?" The court's query, under these circumstances, could reasonably be understood to convey that attorney-client communications would not be without limitations during these proceedings.

In a criminal trial or preliminary examination involving either an English-speaking defendant or a non-English speaking defendant, it is necessary for a defendant and counsel to have some means of immediate communication as testimony is being taken, objections are being made, and rulings by the court are issued. As stated in *People v. Rioz* (1984) 161 Cal.App.3d 905, "in any proceeding at which witnesses are called and testimony taken, *the fundamental rights of a defendant to understand the proceedings*

*being taken against him and to immediately communicate with counsel when the need*

*arises require that each non-English-speaking defendant be afforded an individual*

*interpreter throughout the proceedings.*" (*Id*. at p. 913, italics added.) Because "the one

interpreter could not act even as a proceedings interpreter and as defense interpreter for

all defendants, the conclusion is inescapable that [a] defendant[] [will] not know at all

times what [is] going on in the proceedings, or they had no effective means of

communicating with their respective attorneys at critical points of the [proceeding], or

both." (*Ibid*.) Similarly, requiring that Molina share a proceedings interpreter during his

preliminary hearing involving three defendants limited Molina's ability to meaningfully

engage with counsel for his own defense during a critical stage of the proceeding.

Second, the error in failing to provide an individual interpreter for Molina was

compounded by the importance and the compromised nature of Witness 1 and Witness

2's testimony. Their testimony formed, in part, the basis for the holding order for the

crimes of conspiracy to commit murder, murder, and the related allegations that the

murder was committed by means of lying in wait, committed for the benefit of a street

gang, and that Molina personally and intentionally discharged a firearm in committing

the murder. Although there was circumstantial evidence at the preliminary examination

placing Molina at the scene of the murder through DNA, the gravamen of the evidence

related to conspiracy to commit murder, murder, lying in wait, and personal and

intentional discharge of a firearm was entirely dependent on the testimony of Witness 1

and Witness 2 and their credibility. It is undisputed that both witnesses: 1) had

cooperation agreements with the District Attorney's Office which, in exchange for their

testimony against Molina, allowed them to avoid being charged as adults; 2) testified that

they directly participated in the murder by stabbing the victim multiple times; and 3)

21

initially lied to police about their (and Molina's) involvement in the murder.[14]  In fact, upon learning that other members of the gang were speaking to the police, Witness 1 initially claimed that Witness 2 was the shooter.  Once an offer was made by the District Attorney's Office, wherein Witness 1 understood that he would not be charged as an adult and would be released at the age of 25, he implicated Molina as the shooter.

The cooperation agreement and the issues with Witness 1 and Witness 2's testimony do not mean that these witness could not provide credible testimony against Molina.  Rather these issues highlight the importance of affording Molina and his counsel an immediate opportunity to communicate (through a defense interpreter) in order to thoroughly understand and discuss their testimony while they were on the stand.  In circumstances, like here, where a defendant knows the witness or witnesses, the defendant becomes the primary source of knowledge to immediately equip defense counsel with information to further impeach that testimony or the witness's credibility.  A defendant unable to communicate with counsel during such testimony is relegated to the role of a spectator in his own criminal case.  Under such circumstances, and as repeatedly argued by counsel before, during, and after the preliminary examination, there were considerable lost opportunities for Molina to engage in the most fundamental aspects of attorney and client consultation during a criminal proceeding.  For example, as discussed in *Negron*, a defendant's inability to communicate with his or her counsel in real time, at a minimum hampers counsel's ability to prepare an adequate cross-examination.  (*Negron*, *supra*, 434 F.2d at p. 390.)  Under California law, Molina was required to be provided with an individual interpreter during the preliminary examination to engage with his counsel and to thoroughly challenge the evidence being presented against him.

---

[14] Witness 1 testified that he told police "quite a lot of lies" about the killing after he was arrested, while Witness 2 testified that he lied to police regarding "a lot of the important details about what happened," including his involvement in the killing.

Third, and finally, prejudice is further established in the record by the significant amount of time Molina was required to share an interpreter for the preliminary examination. Our Supreme Court stated in *Rodriguez*, "[I]n some cases, even where some deprivation is shown, the absence of a personal interpreter may be found harmless because the proceedings which took place while the interpreter was absent may be insubstantial or concern matters which are not possibly prejudicial to the defendant …." (*Rodriguez*, supra, 42 Cal.3d at p. 1015.) Here, however, critical moments occurred over the course of the preliminary examination lasting 15 months and 13 sessions, during which Molina was not provided with an individual interpreter.

Molina's counsel repeatedly objected to the lack of an individual interpreter for his client, citing issues with the audio equipment, challenges caused by COVID protocols, and the lack of a Spanish translation of the English that became the record. Requiring Molina to share a proceedings interpreter during the testimony of Witness 1 and Witness 2 limited Molina's ability to meaningfully engage with his defense counsel at a critical stage of the proceeding. The error in failing to provide an individual interpreter for Molina was compounded by the import and the compromised nature of the testimony of those witnesses. Further, Molina was required to share an interpreter throughout the course of the extended preliminary examination. Based on our independent review of the magistrate's order and the entire record, we conclude that the error in not providing Molina an individual interpreter, under the circumstances presented here, was "not minor but 'reasonably *might* have affected the outcome' " of the preliminary hearing. (*Standish*, *supra*, 38 Cal.4th at p. 883.)

### D. The superior court's response

Finally, we briefly address several of the superior court's arguments in response to the writ petition and explain why they cannot govern our decision in this case. We note that the superior court's response does not address the constitutional aspects of the writ

23

petition but limits its discussion to the adverse impacts to court operations, procedures, and finances that would accrue were we to grant the petition. The superior court argues: (1) it only has a limited number of full-time Spanish-language interpreters; (2) its courtrooms are not physically capable of accommodating separate interpreters, along with their equipment, for each defendant; (3) having separate interpreters would be disruptive to the proceedings as multiple attorney-client conversations would possibly be occurring simultaneously; and (4) requiring multiple interpreters at preliminary examinations will adversely affect court finances.

In a preliminary examination involving three defendants and a witness who concurrently required interpreter services, we fully appreciate the superior court's articulated concerns regarding personnel, finances, physical space, and the challenges associated with providing for "simultaneous attorney-client communications" through individual interpreters. However, as discussed earlier, our Supreme Court has determined that the California Constitution requires that a non-English speaking criminal defendant be provided an individual interpreter during the entire course of a criminal proceeding, which includes preliminary examination and trial. We are not aware of any exceptions to this requirement, and it would be inappropriate for us to consider the aforementioned arguments by the superior court as a basis for our determination in this case. Unfortunately, our trial courts regularly face the unenviable task of stretching limited resources to meet the obligations of their daily operations and our decision today is not meant to minimize this reality. Nevertheless, this court and the superior court are required to follow the law, including the decisions of our Supreme Court, that dictate Molina be provided an individual interpreter during his preliminary examination.

Under the circumstances presented here the error in not providing an individual interpreter for Molina "reasonably might have affected the outcome" of the preliminary examination (*Konow*, *supra*, 32 Cal.4th at p. 1024), and therefore we must issue a

24

peremptory writ of prohibition. If the district attorney refiles charges and a new preliminary examination takes place, the superior court must determine how to satisfy the requirement for an individual interpreter for Molina despite some of the understandable challenges identified in its response.

### III.   DISPOSITION

Let a peremptory writ of prohibition issue: (1) restraining respondent court from taking any further action against petitioner Milton Jonas Arias Molina based upon the charges in the information in the above-entitled action, and (2) directing respondent court to vacate its November 4, 2022 order denying petitioner's Penal Code section 995 motion to set aside the information and to enter a new order granting the motion, without prejudice to the Santa Cruz County District Attorney refiling the charges. The respondent court is further directed to provide a separate interpreter for petitioner throughout any subsequent criminal proceedings, including a renewed preliminary examination. This opinion is made final as to this court seven days from the date of filing. (Cal. Rules of Court, rule 8.490(b)(2)(A).) Upon issuance of the remittitur, the temporary stay is vacated.

25

_____
WILSON, J.

WE CONCUR:

_____
BAMATTRE-MANOUKIAN, ACTING P.J.

_____
GROVER, J.

H050669
*Molina v. Superior Court*

| | |
|---|---|
| Trial Court: | Santa Cruz County Superior Court |
| Trial Judge: | Hon. Paul P. Burdick |
| Counsel for Petitioner Milton Jonas Arias Molina: | James McMillin Heather Ruth Rogers Santa Cruz County Public Defender  Athena Rose Reis Biggam, Christensen & Minsloff |
| Counsel for Respondent The Superior Court of Santa Cruz County: The People Real Party in Interest | Brady A. Baldwin Alice X. Wang Office of the Attorney General  Gregory James Peinado Santa Cruz County District Attorney's Office  Johanna Rose Schonfield Office of District Attorney, Santa Cruz County |

H0550669
*Molina v. Superior Court*